AO 91 (Rev. 11/11) Criminal Complaint

# UNITED STATES DISTRICT COURT
for the
Northern District of New York

| United States of America | ) |
| v. | ) |
| Juan Felix, d/o/b xx/xx/1983 and Katie Bessette, d/o/b xx/xx/1988 | ) Case No. 1:17 MJ 536 (DJS) |
| *Defendant(s)* | ) |

U.S. DISTRICT COURT - N.D. OF N.Y.
FILED
DEC 0 4 2017
AT_____ O'CLOCK
Lawrence K. Baerman, Clerk - Albany

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of  Sept. 30, 2017 and Dec. 3, 2017  in the county of  Albany  in the  Northern  District of  New York , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| Count 1: 21 U.S.C. §§ 841(a)(1), (b)(1)(B) & 846 | Conspiracy to Distribute 500 Grams of More of Cocaine |

This criminal complaint is based on these facts:

☑ Continued on the attached sheet.

_____
*Complainant's signature*

FBI S/A Andrew Zubik
*Printed name and title*

Sworn to before me and signed in my presence.

Date: Dec 4, 2017

_____
*Judge's signature*

City and state:  Albany, New York   Hon. Daniel J. Stewart, U.S. Magistrate Judge
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

STATE OF NEW YORK    )
                     ) cc
COUNTY OF ALBANY     )

I, Andrew Zubik, having been first duly sworn, do hereby depose and state as follows:

## INTRODUCTION

*Agent Background*

1. I am a Special Agent with the Federal Bureau of Investigation (FBI) and have been since February 2016. I am assigned to the FBI Albany Division, Albany, New York. I have investigated a variety of federal crimes involving domestic, international terrorism and have aided in narcotics investigations. I have experience regarding these federal violations through my daily investigative responsibilities and extensive training.

2. During my time as a Special Agent, I have been a team leader on the execution of several search warrants for narcotics within the residences and business locations of individuals suspected of possessing with intent to distribute narcotics.

3. In accordance with my present duties, I make this affidavit in support of a criminal complaint charging Juan Felix, d/o/b xx/xx/1983 and Katie Bessette, d/o/b xx/xx/1988 with a violation of Title 21 U.S.C. §§ 841(a)(1), (b)(1)(B) & 846 [Conspiracy to Distribute 500 Grams or More of Cocaine].

4. I make this affidavit from personal knowledge based on my participation in this investigation, and review of reports by myself and/or other law enforcement agents, communication with others who have personal knowledge of the events and circumstances described herein, and information gained through my training and experience. The information outlined below is provided for the limited purpose of establishing probable cause and does not contain all details or all facts of which I am aware relating to this investigation.

## SUMMARY OF THE INVESTIGATION

*Background Information on Juan Felix*

5. Juan Felix, the initial target of this investigation, is a 34 year old U.S. citizen who is believed to be married and the father of numerous children and stepchildren. Juan Felix lives with his family in Albany, New York. Juan Felix is a convicted felon as a result of his March 16, 2005 conviction in Albany County Court for Criminal Possession of a Narcotic Drug in the Fourth Degree, in violation of New York State Penal Law Section 220.09(1). For this offense, Felix was sentenced to two to six years in prison and had his driver's license suspended for six months. The aforementioned conviction involved Felix's possession of approximately 4.5 ounces of cocaine with the intent to distribute said cocaine.

6. On July 7, 2007, Juan Felix is believed to have been arrested by the Albany Police Department for possessing 4.7 grams of cocaine. Investigators currently do not have any further information as to the disposition of the arrest.

*Summary of Juan Felix's and Katie Bessette's Criminal Conduct Under Investigation*

7. Between about September 30, 2017 and December 3, 2017, Juan Felix, Katie Bessette, and others are suspected of conspiring to distribute 500 grams or more of cocaine, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(B) & 846

8. In particular, Juan Felix and Katie Bessette are suspected of conspiring to distribute 500 grams of cocaine to a cooperating witness (hereinafter "CW#1"), in exchange for $15,000.00 in United States currency.

## DETAILS OF THE INVESTIGATION

*Genesis of the Investigation*

9. In July of 2017, CW#1 was arrested by Albany, NY FBI Agents for a variety of fraud offenses.[1] Shortly after CW#1's arrest, he/she agreed to actively cooperate with the FBI.

10. During a post-arrest debriefing of CW#1, he/she brought up the name of Juan Felix and explained that he/she knew Juan Felix for several years because of the their prior real estate dealings, to include the purchase and sale of night clubs in the Albany, New York area. CW#1 has also told investigators that, in the past, he/she had helped broker cocaine transactions between Juan Felix and another individual living in the Capital District.

11. After CW#1 told investigators about Juan Felix, a variety of local investigators reported that they too had received information from different sources that caused them to suspect that Juan Felix was still involved in the buying and selling of cocaine.

*CW#1 Meets Juan Felix and Inquires About His Interest in Brokering a Cocaine Transaction*

12. On September 30, 2017, CW#1 met with Juan Felix to, in part, assess whether Felix was still involved in the trafficking of illegal narcotics, and inquire whether Felix would either sell CW#1 cocaine, or put CW#1 in touch with one of Felix's associates who could sell CW#1 cocaine.

13. The September 30, 2017 meeting between CW#1 and Juan Felix occurred at his Albany, New York residence. The meeting was recorded by CW#1. During the meeting, CW#1 and Felix discussed a variety of things, including previous drug deals involving the buying and selling of cocaine from Columbians based in New York City. During the meeting Felix also made some comments to suggest that he purchased his current residence with proceeds from drug trafficking.

---

[1] Beyond the instant arrest for CW#1, CW#1 does not have any criminal history.

3

14. Below are some excerpts from the September 30, 2017 meeting in which Felix is believed to be discussing the value of his current residence, prior and current drug trafficking activities (including a recent theft of drugs from one of Felix's stash houses), and the legal perils that come from trafficking in illegal drugs.

*In the excerpts below, Juan Felix is believed to be discussing the value of his residence*:

JUAN FELIX   A year and over two hundred racks[2] (PH) later.

CW#1   Word to mother? (PH) Shit.

JUAN FELIX   All, all total, all total with the landscaping outside it was like two thirty.

CW#1   Word?

JUAN FELIX   (UI)

CW#1   You get, you get um, appraisal done?

JUAN FELIX   I'm waitin'—

CW#1   (UI)

JUAN FELIX   --I'm waitin' because Bank of America (PH) is about to give me like two hundred racks (PH) in equity. (UI)—

CW#1   Oh they are?

JUAN FELIX   --equity line.

CW#1   Oh word?

JUAN FELIX   They said just from what I told 'em, um, um, without doin' the walk through they said we'll, we'll give you a hundred right now. We don't even want a walk-through.

CW#1   Wow.

JUAN FELIX   But we wanna walk through—

CW#1   Yeah.

---

2 Upon information and belief "racks" is slang for $1,000.00.

JUAN FELIX --so we can get you more.

*Later in the conversation, Juan Felix told CW#1 about some cocaine that was recently stolen from one of Juan Felix's stash houses:*

CW#1  So, that's what it is. So that's why I was comin' to talk to you about that—those, those deals and shit but I really wanted those two spots on Liv-Livingston—[3]

JUAN FELIX  Yeah.

CW#1  --but I mean I'm glad it worked out for you.

JUAN FELIX  Well, (UI)—

CW#1  I know that shit was goin' on with D (PH) at the time—

JUAN FELIX  --what, what—no what I'm—what had happened was, is I was dealing with somebody (UI)

CW#1  Yup.

JUAN FELIX  I was usin' the one and I was workin' in there's stash house.

CW#1  Oh okay.

JUAN FELIX  We—you know, we were comin' to get it and pumpin' it, gettin' it, gettin' it—[4]

CW#1  Yeah.

JUAN FELIX  --you know, gettin' it, gettin' it gettin' it.

CW#1  Yeah.

JUAN FELIX  Half of that was in there. Somebody got in and they took it.[5]

CW#1  So somebody knew.

---

3 Upon information and belief, CW#1 was referencing two parcels of real estate on Livingston Avenue in Albany, NY that CW#1 had previously expressed an interest in purchasing himself.
4 Investigators suspect that "gettin' it" is slang for the rapid buying and selling of narcotics.
5 Investigators believe that the "it" is in reference to illegal narcotics, likely cocaine.

JUAN FELIX   So dude told me straight up, he said you already know. You ain't doin' nothin' with them houses because if you can't come up with my money, I'm takin' them houses.

CW#1   Oh shit. Oh nigger gave it to you (UI) the house. Yeah.

JUAN FELIX   When I was like, when I was like yo I got some serious shit goin' on—

CW#1   Yeah, yeah. I know--

JUAN FELIX   I didn't wanna come out, you know what I'm sayin'?

CW#1   Yeah. Yeah, yeah, yeah, yeah.

JUAN FELIX   Because I'm—now I'm like—now I'm, I'm fucked up with these people, I'm fucked up with you because I told you yo, you have my word you can have the motherfuckin' houses.

CW#1   Yeah. Yeah, yeah.

JUAN FELIX   And my all intents and purposes—

CW#1   Yeah.

JUAN FELIX   --go 'head—

CW#1   Yeah.

JUAN FELIX   --g—two days later I go down there, and the shit's fuckin' gone. They broke one of the windows in the middle of the alley, that's how they got in.

CW#1   Wow. So I mean who else knew?

JUAN FELIX   It was somebody, it was somebody in the fuckin' neighborhood again. So, not for nothin' we kinda, we kinda had an idea of what porch they came from.

*Later in the conversation Juan Felix is believed to discuss how much money he owed to his supplier of the drugs that were ultimately stolen from Juan Felix's stash house, and how he is going to be more cautious in the future:*

CW#1   So I mean at the end of the day how much you owe him? (UI) a hundred racks or some shit?

6

JUAN FELIX   At the end of the day...at the end of the day it was like, it was like twenty-seven that I had to get. (PH)[6]

CW#1   Twenty-seven racks?

JUAN FELIX   Yeah.

CW#1   Still, that's still—

JUAN FELIX   (UI)

CW#1   --that's still bread.

JUAN FELIX   All I did, all I did is I went two blocks over to my man over there got (UI) couple fuckin' bricks of soft (PH),[7] got it up here, made the money up, paid that man his twenty-seven—

CW#1   Yeah.

JUAN FELIX   --paid back the two bricks. I pocketed twenty or thirty.

CW#1   Oh, yeah.

JUAN FELIX   And that was it. Right there I'm like that's it, it's done. No more of this fuckin' bullshit.

CW#1   Yeah.

JUAN FELIX   (UI) I got a newborn baby.

CW#1   Yeah.

JUAN FELIX   I'm, I'm here holdin' my daughter, three hours before that I had a fuckin' forty-five in my neck.

CW#1   Wow.

JUAN FELIX   You know what I'm sayin'?

CW#1   It make you reflect—that shit'll make you reflect on life—

JUAN FELIX   Yeah, yeah. Oh yeah.

---

6 Investigators suspect that Juan Felix is saying that he owed $27,000 to his supplier for the cocaine that was ultimately stolen from Juan Felix's stash house.
7 Upon information and belief, "bricks of soft" are slang references to two kilograms of powder cocaine.

7

*<u>At the conclusion of the meeting CW#1 asked Juan Felix if Felix could supply him/her with some cocaine and Juan Felix discusses the legal perils of buying and selling drugs</u>*:

JUAN FELIX   I miss them days.

CW#1   (Laughter) Wow.

JUAN FELIX   Yup.

CW#1   Yeah. Well yeah if you could even give me like—if you get me a little like a, like a little sample or whatever, you know?

JUAN FELIX   Yeah I, I—

CW#1   If you can get that let me know man.

JUAN FELIX   --I could ask some friends see um, see---

CW#1   Yeah.

JUAN FELIX   --see what he's goin' on. Like I said I—after that fuckin'—after all that bullshit man, that shit scared me straight.

CW#1   Yeah.

JUAN FELIX   You know what I'm sayin'? I fuckin'—

CW#1   No, I know.

CW#1   It's good.

JUAN FELIX   Hell yeah.

CW#1   You know? For real. But yeah let me know on that thing bro.

JUAN FELIX   Absolutely.

CW#1   Let me know on that thing. Um—

JUAN FELIX   (UI)

CW#1   --just hit me or whatever.

JUAN FELIX   I'll, I'll, I'll ask a friend of mine to see, see—

8

CW#1        Yeah.

JUAN FELIX  --what he says, you know what I'm sayin'?

CW#1        Give me, give me a number or whatever. You can—if you gotta—if you want me to meed you somewhere quick out, 'cause I don't like—

JUAN FELIX  Yeah, yeah we—

CW#1        --'cause I don't like fuckin' with the phone. (Laughter)

JUAN FELIX  (UI)

CW#1        Yeah we could have some coffee or whatever.

JUAN FELIX  (UI) all my, all my boys are still involved in the madness.

CW#1        They still go hard?

JUAN FELIX  I tell 'em I'm like yo listen man, not for nothin' if you—

CW#1        Eventually—

JUAN FELIX  --(UI) you still involved in the madness, like, if, if you sellin' weed that's one thing.

CW#1        Yeah.

JUAN FELIX  But i-if you're doing numbers with anything besides weed, I can't have you at my house, I don't want you callin' my phone.

CW#1        Yeah.

JUAN FELIX  Like when I see you I see you. I know where you live, you know what I'm sayin'? Like I'm not gonna get roped into somethin' because—

CW#1        And it's easy to.

JUAN FELIX  Yeah.

CW#1        Yeah it's easy to.

JUAN FELIX  These motherfuckers don't even need no, no drugs nowadays. All they gotta do is get five people on the phone sayin' like oh yeah that bitch was ugly as hell. They were talkin' about the purity of drugs was bad, let's give 'em all twenty years. Conspiracy, hardest case to beat.

9

| | |
|---|---|
| CW#1 | Wow. |
| JUAN FELIX | A-and what they do is, you can go to trial in a Federal court room and you'll lose, and we're gonna give you natural life and kingpin status, which means that a—that adds another fifty years on top of the thirty for the natural life, or you can just cop out to fifteen right now. They, they, they ,they—back to the wall. An-and this is the shit they tell you, we got you on, on tape talkin' about pure—and you—i-i-it might not be it. You coulda just been dealin' with some ugly hood booger. |
| CW#1 | Yeah. |
| JUAN FELIX | But if they can tie one person to a legal doing, and think that they have code between other phone calls, they got every one of yous and there's always that one person that's like, fifteen years, fuck this. Call my lawyer, I'ma tell him some shit, and then ten more people get jammed up. |
| CW#1 | Wow. |
| JUAN FELIX | And then ten more people get jammed up. |
| CW#1 | Wow. |
| JUAN FELIX | Yup them Feds are dirty man. They don't even need the fuckin' evidence no more, all they need is fuckin' phone calls sayin' that you motherfuckers were talkin' in code about somethin'. |
| CW#1 | Wow. |
| JUAN FELIX | Yup. Yup. That's what's scary. |
| CW#1 | Oh, yo. (Laugh) That shit scared me my entire life. |
| JUAN FELIX | That, that—ju-just this conversation right now, you askin' me yo, could you reach out to somebody and give me a number on that, they could give us twenty years for that. |
| CW#1 | Oh shit. Word? |
| JUAN FELIX | Just because of my past. |
| CW#1 | Well what'you got? |
| JUAN FELIX | I got a couple charges. |

10

CW#1        You did?

JUAN FELIX I had a Fed case when I was twenty years old.

*Communications Between Juan Felix and CW#1 After Their September 30, 2017 Meeting:*

15. Following the September 30, 2017 face-to-face meeting, CW#1 remained in contact via text message with Juan Felix, texting Felix via his smartphone bearing cellular telephone number (518) 495-7361. In the various text messages, CW#1 and Felix discussed several cocaine deal scenarios, including CW#1 trading a sport utility vehicle for cocaine, a house for cocaine, and a motorcycle for cocaine. The proposed sport utility vehicle and house were valued at approximately $15,000 each which would have bought a half kilogram of cocaine. In one text message response, Felix lamented that he had to work twice as hard to make honest money as compared with his efforts expended in dealing in drugs. In another text message CW#1 asked Felix for help procuring cocaine to which Felix demurred stating he had been out of that "game" for some time.

*Juan Felix Asks CW#1 for Help in Procuring a New York State Vehicle Inspection Sticker:*

16. On or about November 1, 2017, Juan Felix, using his smartphone with telephone number (518) 495-7361, sent CW#1 a text message and inquired about purchasing a New York State vehicle inspection sticker from CW#1. Felix explained that his "son" (believed to be a reference to one of Felix's biological sons or stepsons) was driving Felix's 2006 Audi A8, that the vehicle had an expired inspection sticker, and consequently, was getting pulled over by law enforcement. Felix further stated the Audi A8 would not pass inspection due to emissions codes.

17. CW#1 agreed to sell Felix a New York State inspection sticker, but stated that he/she would talk to Felix about it in person. A meeting was scheduled for November 4, 2017.

11

*The November 4, 2017 Face-to-Face Meeting Between Juan Felix and CW#1*:

18. On November 4, 2017, CW#1 met Juan Felix at his Albany, New York residence. This meeting was recorded by CW#1. During the meeting CW#1 and Juan Felix discussed (i) Felix's prior drug deals that he had done with a mutual friend of theirs; (ii) Felix's efforts to legitimize the financial records of his home and placing his house in his wife's name in the event Felix got caught for his prior illegal activity; (iii) Felix's willingness to procure $15,000 worth of cocaine to be purchased by CW#1.[8] At the conclusion of the meeting Juan Felix agreed to call a few of his people in order to find someone willing to sell cocaine to CW#1.

*In the excerpts below, Juan Felix agrees to broker a cocaine sale between an unidentified seller and CW#1 (the buyer)*:

| | |
|---|---|
| JUAN FELIX | Im gonna reach out to two or three of my people |
| CW#1 | Alright |
| JUAN FELIX | see whats what |
| JUAN FELIX | whatever I can get you for 15[9] you could probably still |
| CW#1 | yeah I am gonna have to stomp on it[10] |
| JUAN FELIX | But there is a way to bring it back official so it looks like its not been touched |
| CW#1 | okay |
| JUAN FELIX | I could show you that |
| CW#1 | yeah |

---

8 Generally speaking, 500 grams of cocaine can be purchased wholesale for approximately $15,000.00.
9 "15" is slang for $15,000.00.
10 This is slang for increasing the weight of the cocaine by adding a filler.

12

| | |
|---|---|
| JUAN FELIX | I wouldn't need nothin but your fuckin tank top take that shit right off your fuckin back and I'd take a bag of fuckin powder and make that shit a fuckin block[11] |
| CW#1 | straight like that? |
| JUAN FELIX | Straight like that in ten minutes. |

*Juan Felix Hints That He Can Broker a Sale of Cocaine to CW#1*:

19. Later on in the afternoon of November 4, 2017 (after the face-to-face meeting had concluded), CW#1 was contacted by Juan Felix (via his smartphone bearing telephone number (518) 495-7361). Felix stated that he had made some calls and that he and CW#1 should meet in the middle of week to discuss details (presumably of the brokering of a cocaine sale).

*Juan Felix and CW#1 Meet in Person to Discuss Potential Cocaine Deals*:

20. On November 9, 2017, CW#1 met in person with Juan Felix at his Albany, New York home. CW#1 recorded this meeting. During the meeting, CW#1 provided Felix a New York State vehicle inspection sticker that could be used on Felix's 2006 Audi A8. Juan Felix told CW#1 that he had made a couple of telephone calls, and the best he could get CW#1 for $15,000 was 400 grams of cocaine. Juan Felix told CW#1 that it would take a few days to arrange things. Felix also told CW#1 that he would examine the cocaine for CW#1 and make sure the cocaine was pure and of good quality. Felix described to CW#1 how he would be able to cut the 400 grams of cocaine and turn it into 1,200 grams such that the cocaine could sell for $1,000.00 an ounce. Felix stated that when he was going "light" he was pulling in 17 a month in profit.

21. Felix and CW#1 agreed to meet on Tuesday/Wednesday of the following week meaning November 14-15th, 2017 as Felix stated it would take a few days for the cocaine to get to Albany. Felix also stated he was going to put something together for an unidentified buddy of his where

---

[11] Investigators believe that "block" is slang for a compacted package of cocaine, and that Juan Felix is explaining how he can turn a smaller amount of cocaine into a larger amount of cocaine through the use of cutting agents.

he would make a profit off it. Felix and CW#1 continued to have phatic communication where Felix stated he has had hundreds of "last times" selling cocaine.

*Juan Felix Travels to New York City*:

22. On November 8, 2017, the Honorable Daniel J. Stewart, U.S. Magistrate Judge, signed an order authoring authorizing the FBI to (i) install a pen-trap device on Juan Felix's smart phone bearing telephone number (518) 495-7361; and (ii) to collect prospective cell site tower data on said smartphone.

23. Cell site tower data collected on November 19, 2017 shows that Juan Felix's smartphone travelled from a location in and around his Albany New York residence to across the George Washington Bridge towards the Bronx borough of New York City. Data collected further shows that the smartphone spent less than an hour in the vicinity of the Bronx borough and then travelled back to a location in an around Felix's Albany residence. Your affiant suspects that it is Juan Felix who travelled to New York City on November 19, 2017. While it is unknown what Felix did in New York City, it is possible that he met, or tried to meet, with one or more individuals who serve as suppliers of cocaine to Felix.[12]

*Juan Felix and CW#1 Attempt to Set up a Meeting*:

24. Also on November 19, 2017, Juan Felix, using his smartphone bearing telephone number (518) 495-7361, sent CW#1 a text message suggesting that Felix and CW#1 meet for coffee on November 20, 2017.

25. A November 20, 2017 meeting between Juan Felix and CW#1 did not take place, possibly because of complications to a knee injury of which Juan Felix has been suffering. However, in

---

12 New York City is known to law enforcement as a source of cocaine that is often re-distributed in upstate New York.

14

the last several days, Juan Felix and CW#1 have been exchanging text messages in an attempt to iron out the details as to when, and where, the two can meet.

26. In particular, on Saturday, November 25, 2017, Juan Felix, using his smartphone bearing telephone number (518) 495-7361, sent a text message to CW#1 asking if CW#1 was in town. CW#1 responded with a text message advising that he/she would be available to meet on Monday, November 27, 2017.

27. A meeting between Juan Felix and CW#1 on Monday, November 27, 2017 did not take place. However, on Tuesday, November 28, 2017, Juan Felix and CW#1 spoke over the telephone. During the call, Felix told CW#1 to come to his Albany residence between about 3:30 p.m. and 4:00 p.m. on Wednesday, November 29, 2017.

*CW#1 Meets Juan Felix at Felix's Residence on November 29, 2017:*

28. At around 4:00 p.m. on Wednesday, November 29, 2017, CW#1 met with Juan Felix at his Albany residence. This meeting was recorded by CW#1.

29. During the aforementioned meeting, Juan Felix explained that the delays in consummating the previously planned cocaine transaction were primarily due to two factors: (i) a general shortage of a supply of cocaine; and (ii) complications to Felix's knee injury. Felix told CW#1 that for $15,000.00, he/she could either purchase 500 grams of low quality cocaine, or approximately 357 grams of high grade cocaine. CW#1 said that he/she would like to purchase 500 grams of cocaine.

30. Juan Felix then told CW#1 that he/she should expect to receive a text message or telephone call on either the evening of Friday, December 1, 2017, or sometime during the day on Saturday, December 2, 2017. Juan Felix further told CW#1 that the text message or phone call would

contain a time and meeting location at which CW#1 would meet with Felix, presumably to consummate the cocaine transaction.

*CW#1 and Juan Felix Communicate, and Meet, Over the Weekend of December 1-3, 2017:*

31. On Saturday, December 2, 2017, Juan Felix and CW#1 exchanged text messages wherein CW#1 advised that he/she would not be available until the afternoon of Sunday, December 3, 2017. On Sunday, December 3, 2017, Juan Felix and CW#1 agreed that they would meet at a coffee shop in Colonie, New York to complete the planned cocaine transaction.

32. At approximately 4 p.m. on Sunday, December 3, 2017, CW#1 arrived at the aforementioned coffee shop. Juan Felix and CW#1 then met up inside of the coffee shop. After a couple of minutes, Juan Felix and CW#1 exited the coffee shop and entered CW#1's vehicle which was parked in the coffee shop's parking lot.

33. While CW#1 and Juan Felix were sitting inside of CW#1's vehicle, Juan Felix made a telephone call, and shortly thereafter a woman came over to CW#1's vehicle and entered CW#1's vehicle by sitting in the back seat.

34. While the woman was inside of CW#1's vehicle, she handed CW#1 approximately 500 grams of cocaine. CW#1 then handed Juan Felix $15,000.00 in U.S. currency. Moments later, investigators approached CW#1's vehicle and executed warrantless arrests of Juan Felix and the woman. The woman's identity was subsequently determined to be Katie Bessette, d/o/b xx/xx/1988.

**REQUEST FOR A CRIMINAL COMPLAINT**

35. Based upon my experience, training, and the totality of circumstances in the above information, there is probable cause to believe that between about September 30, 2017 and December 3, 2017, Juan Felix and Katie Bessette did knowingly and intentionally combine, conspire, confederate

16

and agree with one or more other persons to distribute 500 grams or more of cocaine, a Schedule II controlled substance, in violation of Title 21 U.S.C. §§ 841(a)(1), (b)(1)(B) & 846 [Conspiracy to Distribute 500 Grams or more of Cocaine].

_____
Andrew Zubik
Special Agent
Federal Bureau of Investigation

Sworn to me this 4th day of December, 2017.

_____
Hon. Daniel J. Stewart
U.S. Magistrate Judge
Northern District of New York

17